[No. A094975. First Dist., Div. One. June 25, 2002.]

SUSAN KANTER et al., Plaintiffs and Appellants, v.
WARNER-LAMBERT COMPANY et al., Defendants and Respondents.

**COUNSEL**

Zelle, Hofmann, Voelbel, Mason, & Gette, Daniel S. Mason, Joseph W. Bell, Dan Zoloth Dorfman; Gordon-Creed, Kelley, Holl & Sugerman, Kevin J. Holl and Jeremy Sugerman for Plaintiffs and Appellants.

Kaye Scholer, Jeffrey S. Gordon, David Klingsberg, Thomas A. Smart and Richard A. DeSevo for Defendants and Respondents Warner-Lambert Company and Pfizer Inc.

Sedgwick, Detert, Moran & Arnold, Michael F. Healy and Wayne A. Wolff for Defendant and Respondent Care Technologies, Inc.

## OPINION

**MARGULIES, J.**—Plaintiffs Susan Kanter and Sharlon Plunk sued defendants Warner-Lambert Company, Pfizer Inc., and Care Technologies, Inc., the manufacturers of NIX, RID, and CLEAR, over-the-counter drugs for the treatment of head lice. Framed as a class action, the complaint alleged that the product labels contain false and misleading statements about the effectiveness of the drugs. The complaint contained several state law claims, including breach of express warranty and false advertising, and a claim for breach of written warranty under the federal Magnuson-Moss Warranty Act. Plaintiffs sought refunds of the purchase price of the drugs, an order banning their sale in their current formulations or requiring their relabeling, and other related relief.

The question in this appeal is not whether the allegations of plaintiffs' complaint have merit, but whether their claims are preempted by federal law. The trial court granted summary judgment for defendants on the ground that the claims were expressly preempted by title 21 of the United States Code section 379r(a), a provision of the Food and Drug Administration Modernization Act of 1997 (FDAMA) (Pub.L. No. 105-115 (Nov. 21, 1997) 111 Stat. 2296). We agree with the trial court and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *Approval of New Drugs by the Food and Drug Administration*

Familiarity with the procedures of the federal Food and Drug Administration (FDA) for approving the marketing of drugs is a prerequisite to an understanding of the facts, issues, and arguments in this appeal. Under the Federal Food, Drug, and Cosmetic Act (FDCA) (21 U.S.C. § 301 et seq.), a drug manufacturer is prohibited from marketing a new drug unless the FDA has approved the drug as both safe and effective for its intended use.[1] (§ 355(a); see generally *Weinberger v. Hynson, Westcott & Dunning* (1973) 412 U.S. 609, 612-613 [93 S.Ct. 2469, 2474-2475, 37 L.Ed.2d 207].)

A manufacturer seeking approval of a new drug must submit a detailed new drug application in accordance with the requirements of the FDCA and related regulations promulgated by the FDA. (§ 355(b)(1); 21 C.F.R.

[1]Unless otherwise indicated, all section references are to title 21 of the United States Code.

§§ 314.1-314.3, 314.50 (2001).) Among other information, a new drug application must include "substantial evidence" that the drug is safe and effective, meaning "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." (§ 355(d); see 21 C.F.R. § 314.126 (2001) [explaining characteristics of "adequate and well-controlled study"].)

A new drug application must also include "specimens" of the labeling proposed for the drug. (§ 355(b)(1)(F); see 21 C.F.R. §§ 314.50(c)(2)(i) (2001) [application must include proposed text of labeling], 201 et seq. (2001) [general labeling provisions].) If the FDA determines that the labeling of a new drug is false or misleading in any particular, the drug is deemed "misbranded." Whether labeling is false or misleading depends not only on its stated or suggested representations, but also on the extent to which it fails to reveal any material facts. (§§ 352(a), 321(n).) The application will be refused if the FDA determines that the labeling is false or misleading in any particular, if the application contains an untrue statement of a material fact, or if the proposed labeling does not comply with the requirements established in the regulations. (§ 355(d)(7); 21 C.F.R. § 314.125(b)(6), (7), (8) (2001).)

After a new drug application has been approved, any change in the labeling requires a supplement to an application and approval by the FDA, either before or after the change. (21 C.F.R. §§ 314.70(b), (c), 314.71 (2001).) Furthermore, the FDA has the power to withdraw its approval of a drug for reasons related to its safety or effectiveness, including a determination by that agency on the basis of new evidence that the drug does not have the effect represented or suggested on its labeling or that the labeling is false and misleading in any particular. (§ 355(e); 21 C.F.R. § 314.150(a)(2)(iii), (iv), (b)(3) (2001).)

The FDCA expressly prohibits the manufacture and distribution of any misbranded drug (§ 331(a), (b), (c), (g), (k)), and it authorizes the United States to bring enforcement actions seeking injunctive relief and civil or criminal penalties. (§§ 332-334.) But it does not create a private cause of action for violation of its provisions. (§ 337(a); *In re Orthopedic Bone Screw Products* (3d Cir. 1999) 193 F.3d 781, 788.)

### B.  *Monographs for Over-the-counter Drugs*

The FDA has adopted another system for evaluating whether the hundreds of thousands of over-the-counter drugs available to consumers are safe, effective, and not misbranded. Under the over-the-counter drug monograph system, the FDA appoints advisory review panels of qualified experts to evaluate the safety and effectiveness of over-the-counter drugs, to review their labeling, and to advise on the promulgation of monographs establishing conditions under which particular categories of over-the-counter drugs can be marketed.[2] (21 C.F.R. §§ 330.1, 330.10(a) (2001); *id.*, § 330.14(a) (2002); see generally *Weinberger v. Bentex Pharmaceuticals, Inc.* (1973) 412 U.S. 645, 650-651 [93 S.Ct. 2488, 2492-2493, 37 L.Ed.2d 235]; *Cutler v. Hayes* (D.C. Cir. 1987) 818 F.2d 879, 882-884.) The FDA publishes proposed and tentative final monographs for public review and comment, and eventually promulgates a final monograph in the form of regulations in the Code of Federal Regulations. Those regulations establish conditions under which a category of over-the-counter drugs is recognized as safe and effective and not misbranded. (21 C.F.R. § 330.10 (2001); see *Cutler v. Hayes, supra,* at p. 884.)

An over-the-counter drug is generally recognized as safe and effective and not misbranded if it meets each condition in the regulations governing such drugs and in any applicable monograph. (21 C.F.R. § 330.1 (2001).) The regulations for all over-the-counter drugs include labeling requirements. Under the heading "Uses," the label must "contain the labeling describing the 'Indications' that have been established in an applicable [over-the-counter] drug monograph or alternative truthful and nonmisleading statements describing only those indications for use that have been established in an applicable monograph . . . ." (21 C.F.R. § 330.1(c)(2) (2001).) Another general regulation provides that the labeling of over-the-counter drugs must be "clear and truthful in all respects and may not be false or misleading in any particular." Labeling must state intended uses and results, directions for proper use, and warnings against unsafe use, side effects, and adverse reactions "in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under customary conditions of purchase and use." (21 C.F.R. § 330.10(a)(4)(v) (2001).)

Under the regulations, "[a]ny product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." (21 C.F.R. § 330.10(b) (2001).)

---

[2]The term "monograph" has been defined as "a learned detailed thoroughly documented treatise covering exhaustively a small area of a field of learning." (Webster's 3d New Internat. Dict. (1986) p. 1462.)

## C. *FDA Approval of NIX*

Defendant Warner-Lambert Company (Warner-Lambert) manufactures NIX, now marketed as an over-the-counter product for the treatment of head lice. In 1986, the FDA approved a new drug application for NIX to be sold as a prescription drug.. The description section of the approved labeling for the product described NIX as "a topical pediculicide and ovicide for the treatment of infestation with *Pediculus humanus* var. *capitis* (the head louse) and its nits (eggs)." The indications and usage section of that label stated: "Nix is indicated for the single-application treatment of infestation with *Pediculus humanus* var. *capitis* (the head louse) and its nits (eggs)."

In 1990, the FDA approved a new drug application allowing the sale of NIX as an over-the-counter product. The indications section of the approved labeling stated: "For the treatment of head lice." The product benefits section of that label stated in part: "Nix Creme Rinse kills lice and their unhatched eggs with only one application. Nix protects against head lice reinfestation for a full 14 days." The directions section of the label stated in pertinent part: "A single application is sufficient. Retreatment is required in less than 1% of patients. If live lice are observed seven days or more after the first application of this product, a second treatment should be given." The approved label for the front panel of the package stated:

> "One Application
> "Kills Lice & Their Eggs
> "Prevents Reinfestation"

For the entire period covered by plaintiffs' complaint, the FDA-approved labeling for NIX stated that the product was indicated "[f]or the treatment of head lice" and that the product "[k]ills lice and their eggs."

## D. *RID and CLEAR and the Pediculicide Drug Monograph*

In 1993, the FDA issued a final monograph for over-the-counter pediculicide drug products for the treatment of head, pubic, and body lice, specifying the sole active ingredients for such products and establishing other conditions under which they are "generally recognized as safe and effective and not misbranded." (58 Fed.Reg. 65452-01 (Dec. 14, 1993).) That monograph, which appears as parts 358.601 through 358.650 in title 21 of the Code of Federal Regulations, provides that an over-the-counter pediculicide drug product in a form suitable for topical application is generally recognized as safe and effective and is not misbranded if it meets each condition in the monograph and each general condition in part 330.1 of title 21 of

the Code of Federal Regulations. (21 C.F.R. § 358.601(a) (2001).) With respect to labeling, the monograph requires the product to state, under the heading *"Indications,"* the following: " 'For the treatment of head, pubic (crab), and body lice.' " It also requires the product to state, under the heading *"Directions,"* the following: " 'A fine-toothed comb or a special lice/nit removing comb may be used to help remove dead lice or their eggs (nits) from hair. A second treatment must be done in 7 to 10 days to kill any newly hatched lice.' " (21 C.F.R. § 358.650(b), (d)(2), (3) (2001).)

Defendants Pfizer Inc. (Pfizer) and Care Technologies, Inc. (Care) manufactured and sold RID and CLEAR, respectively. It is undisputed that RID and CLEAR are pediculicides within the meaning of the monograph and that their labeling includes the statements that the monograph requires.

## E. *Plaintiffs' Lawsuit*

Plaintiffs filed a complaint for damages and injunctive relief against Warner-Lambert, Pfizer, and Care.[3] The complaint, a putative class action, alleged that NIX, RID, and CLEAR have become ineffective because head lice have developed resistance to the insecticides in the products, but that defendants continue to represent to consumers that the products are effective in killing lice and their eggs.

The complaint alleged breach of written warranty under the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.) and several state causes of action: breach of express warranty (Cal. U. Com. Code, § 2313), fraud and deceit (Civ. Code, §§ 1709, 1710), false advertising (Bus. & Prof. Code, § 17500), unfair competition (Bus. & Prof. Code, § 17200 et seq.), and violations of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.). Plaintiffs sought compensatory damages consisting of all amounts paid by class members for the products, an order enjoining the sale of the products in their current formulations or requiring a warning on the labels that head lice have become resistant to the products, punitive damages, and attorney fees.

The trial court granted summary judgment in favor of defendants on the ground that all of plaintiffs' causes of action were expressly preempted by section 379r, a provision of the FDAMA.

---

[3]Plaintiffs also named Hogil Pharmaceuticals Corporation, the manufacturer of a product called A-200, as a defendant, but the action against that defendant was automatically stayed after it filed bankruptcy proceedings. (See 11 U.S.C. § 362.)

DISCUSSION

## A. *Introduction*

■ On appeal after the granting of summary judgment, this court conducts de novo review of any underlying issues of statutory construction. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683 [102 Cal.Rptr.2d 97, 13 P.3d 704]; see, e.g., *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 321-322 [93 Cal.Rptr.2d 36, 993 P.2d 366].) Therefore we undertake an independent consideration of the meaning and scope of the federal preemption provision, section 379r.

■ Under the supremacy clause of the United States Constitution, "[w]hen a state statute, administrative rule, or common-law cause of action conflicts with a federal statute, it is axiomatic that the state law is without effect. [Citations.]" (*Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 894 [120 S.Ct. 1913, 1932, 146 L.Ed.2d 914] (dis. opn. of Stevens, J.) (*Geier*).) Consideration of issues arising under that clause starts with the presumption that state laws are not to be preempted by a federal statute unless it is the clear and manifest purpose of Congress to do so. (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407] (*Cipollone*).)

■ The intent of Congress with respect to preemption may be explicitly stated in the language of a statute or implicitly contained in its structure and purpose. When Congress has enacted a provision expressly addressing preemption, and when that provision provides a reliable indication of congressional intent as to state authority, it governs the preemptive scope of the legislation. (*Cipollone, supra,* 505 U.S. at pp. 516-517 [112 S.Ct. at pp. 2617-2618].) The plain wording of an express preemption provision necessarily provides the best evidence of that intent.

The FDAMA is comprehensive and far-reaching legislation that amended the FDCA and other federal statutes "to improve the regulation of food, drugs, devices, and biological products, and for other purposes." (Pub.L. No. 105-115 (Nov. 21, 1997) 111 Stat. 2296.) Under the heading "National uniformity for nonprescription drugs," the FDAMA includes an express preemption provision relating to nonprescription or over-the-counter drugs, which provides in relevant part: "Except as provided in subsection . . . (e) . . . of this section, no State . . . may establish or continue in effect any *requirement*— [¶] (1) that relates to the regulation of a [nonprescription] drug . . . ; and [¶] (2) that is different from or in addition to, or that is otherwise not identical with, a *requirement* under this Act . . . ." (§ 379r(a),

italics added.) Subsection (e) of section 379r is a savings clause, stating, "Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State."

B. *The Savings Clause*

■ Plaintiffs argue initially that it is unnecessary to consider whether any of their claims would result in conflicting state and federal requirements within the meaning of section 379r(a) because their action escapes preemption under the savings clause. They contend that their claims for breach of warranty and fraud are actions under "product liability law" within the meaning of that clause. (§ 379r(e).) The argument is without merit.

■ Settled principles of statutory construction govern our analysis. The starting point for the interpretation of a statute is its language. (*Kaiser Aluminum & Chemical Corp. v. Bonjorno* (1990) 494 U.S. 827, 835 [110 S.Ct. 1570, 1575-1576, 108 L.Ed.2d 842]; *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290].) If that language is plain and unambiguous, there is no need for judicial construction. Instead, a court's sole function is to enforce the statute according to its terms. (*United States v. Ron Pair Enterprises, Inc.* (1989) 489 U.S. 235, 240-241 [109 S.Ct. 1026, 1029-1030, 103 L.Ed.2d 290]; *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641].)

■ The savings clause states plainly and unambiguously that the preemption provisions of the section do not affect "the product liability law of any State." (§ 379r(e).) Under the product liability law of California, injury to the plaintiff from a defective product is an essential element of a cause of action. (See, e.g., *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1110 [56 Cal.Rptr.2d 162, 920 P.2d 1347]; *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 127-131 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].) Liability may be imposed either for personal injury or for physical damage to property, but if the damage consists solely of econo mic losses, recovery on a products liability theory is unavailable. (*Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 18-19 [45 Cal.Rptr. 17, 403 P.2d 145]; *Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 293 [204 Cal.Rptr. 736], and cases cited.)

Plaintiffs acknowledge that their complaint does not allege any personal injury or injury to property as a result of using defendants' products. They

argue, however, that Congress intended "product liability law" within the meaning of section 379r(e) to have a broader meaning, encompassing an expansive category of state common law and statutory actions imposing liability on commercial sellers of products. The argument is inconsistent with the fundamental principle that a savings clause should not be interpreted in such a way as to undercut or dilute an express preemption clause. (*American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214, 227-228 [118 S.Ct. 1956, 1965-1966, 141 L.Ed.2d 222]; *Etcheverry v. Tri-Ag Service, Inc., supra,* 22 Cal.4th at p. 328.) Reading the savings clause as plaintiffs suggest would make the express preemption provisions of section 379r(a) a nullity, and we will not presume that Congress included superfluous provisions or otherwise engaged in an idle act when it enacted the statute. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 634 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

Plaintiffs also claim that certain congressional committee reports and comments of individual senators support their theory that the term "product liability law" in the savings clause can be stretched to include statutory causes of action such as breach of warranty. ■ When a statute is unambiguous, however, its language cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the [legislative] process." (*West Virginia Univ. Hospitals, Inc. v. Casey* (1991) 499 U.S. 83, 98-99 [111 S.Ct. 1138, 1146-1147, 113 L.Ed.2d 68].) ■ Furthermore, legislative history actually contradicts plaintiffs' reading of the phrase as encompassing statutory causes of action and instead confirms its plain meaning. Commenting on the scope of the savings clause, the Senate committee report on the FDAMA states, "Finally, the legislation explicitly provides that it shall not be construed to modify or otherwise affect the *traditional* product liability law of any State. *Tort liability rules and requirements would remain unchanged and unaffected.*" (Sen. Rep. No. 105-43, 1st Sess., p. 66 (1997), italics added.) Plaintiffs have not alleged a cause of action under the traditional product liability law of this state, and the savings clause does not exempt their claims from preemption.

C. *The Existence of Federal Requirements*

Plaintiffs contend that even if the savings clause does not apply, their claims are not preempted because none of their claims about labeling would result in establishment of a state "requirement" different from an applicable federal "requirement" within the meaning of section 379r(a).

As a threshold matter, we must determine whether the statutes and regulations applicable to the labeling of defendants' products establish a federal

requirement that can have preemptive effect. Similar references to conflicting state and federal "requirements" appear in other federal preemption provisions, and courts have labored to ascertain the precise meaning of those references.

In *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] (*Medtronic*), the United States Supreme Court considered a preemption provision of the Medical Device Amendments of 1976 (MDA) (§ 360 et seq.). That act classifies and regulates medical devices based on the risk posed to the public, with the most strictly regulated designated class III. Before a new class III device may be marketed, the manufacturer ordinarily must provide the FDA with " 'reasonable assurance' " that the device is safe and effective by complying with a thorough, rigorous, and costly premarket approval process. (*Medtronic, supra,* at pp. 476-477 [116 S.Ct. at pp. 2246-2247].) Under an exception to that process, the MDA also permits devices to be marketed on a showing that they are "substantially equivalent" to devices already on the market before its effective date. (§ 360e(b)(1)(B).) The question in *Medtronic* was whether the MDA preempted a plaintiff's tort claims against the manufacturer of an allegedly defective pacemaker, which had been approved by the FDA under the less stringent "substantially equivalent" procedure. (*Medtronic,* at pp. 480-481 [116 S.Ct. at p. 2248].)

The express preemption provision of the MDA stated in pertinent part that no state may establish with respect to a device "any requirement" that is "different from, or in addition to, any requirement applicable under this chapter to the device," and "which relates to the safety or effectiveness of the device . . . ." (§ 360k(a)(1), (2).) The provision was supplemented by an FDA regulation, providing in part that state requirements were preempted only when the agency had established specific counterpart regulations or other specific requirements applicable to a particular device. (21 C.F.R. § 808.1(d) (2001).)

A majority of the court in *Medtronic* agreed that a state "requirement" within the meaning of the provision could encompass state common law actions as well as causes of action based on state statutes. (See *Medtronic, supra,* 518 U.S. at pp. 502-503 [116 S.Ct. at pp. 2258-2259] (plur. opn. of Stevens, J.); see *id.* at pp. 503-505 [116 S.Ct. at pp. 2259-2260] (conc. opn. of Breyer, J.); see *id.* at pp. 509-512 [116 S.Ct. at pp. 2262-2263] (conc. & dis. opn. of O'Connor, J.); *Geier, supra,* 529 U.S. at p. 867 [120 S.Ct. at pp. 1917-1918].)

Nevertheless, the court held in a five-to-four decision that none of the plaintiff's common law tort claims were preempted by the MDA.

(*Medtronic, supra,* 518 U.S. at pp. 501-502 [116 S.Ct. at pp. 2258-2259].) While the justices disagreed over the nature of a state requirement, they were unanimous in their view that the "substantially equivalent" procedure was not a federal "requirement" specifically applicable to the particular device in question within the meaning of section 360k(a). (*Medtronic, supra,* at pp. 498-500 [116 S.Ct. at pp. 2256-2258] (maj. opn. of Stevens, J.); see *id.* at p. 508 [116 S.Ct. at pp. 2261-2262] (conc. opn. of Breyer, J.); see *id.* at p. 513 [116 S.Ct. at pp. 2263-2264] (conc. & dis. opn. of O'Connor, J.)[4] The court contrasted the "generality" of the federal labeling and manufacturing requirements under the "substantially equivalent" procedure with circumstances in which the federal government has "weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." The generic requirements under the "substantially equivalent" procedure did not reflect "the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." (*Medtronic, supra,* 518 U.S. at p. 501 [116 S.Ct. at p. 2258].)

Subsequently, several courts have contrasted the procedure at issue in *Medtronic, supra,* 518 U.S. 470, with the MDA's more stringent premarket approval process and concluded that the latter is a device-specific federal requirement that can preempt conflicting state requirements. (*Martin v. Medtronic, Inc., supra,* 254 F.3d at pp. 583-584; *Kemp v. Medtronic, Inc., supra,* 231 F.3d at pp. 226-228; *Mitchell v. Collagen Corp, supra,* 126 F.3d at pp. 911-912; *Steele v. Collagen Corp., supra,* 54 Cal.App.4th at pp. 1487-1488.) Those courts have reasoned that the process constitutes approval of a specific product's design, testing, intended use, manufacturing methods, performance standards, and labeling, and that state law claims based on a theory that the product is mislabeled would impermissibly add requirements different from or in addition to those established by the federal procedure. (*Martin v. Medtronic, Inc., supra,* 254 F.3d at pp. 584-585; *Mitchell v. Collagen Corp., supra,* 126 F.3d at pp. 913-914.)

The parallels between the premarket approval process for medical devices and the new drug application process with respect to product labeling are

---

[4]For a detailed discussion of the majority, plurality, and concurring and dissenting opinions in *Medtronic, supra,* 518 U.S. 470, see *Martin v. Medtronic, Inc.* (5th Cir. 2001) 254 F.3d 573, 578-579; *Kemp v. Medtronic, Inc.* (6th Cir. 2000) 231 F.3d 216, 223-225; *Mitchell v. Collagen Corp.* (7th Cir. 1997) 126 F.3d 902, 907-910; *Steele v. Collagen Corp.* (1997) 54 Cal.App.4th 1474, 1480-1489 [63 Cal.Rptr.2d 879].)

striking. For instance, both require submission to the FDA of the proposed labeling, which must comply with FDA regulations. (§§ 360e(c)(1)(F), 355(b)(1)(F); see 21 C.F.R. § 201 et seq. (2001) [drug labeling]; id., § 801.1 et seq. (2001) [medical device labeling].) The FDA will deny approval of the drug or device if there is an insufficient showing that it is safe and effective under the conditions of use stated or suggested in the proposed labeling, or if that labeling is misleading in any particular, untrue, or otherwise not in compliance with the regulatory requirements for labels. (§§ 360e(d)(2)(A), (B), (D), 355(d)(5), (6), (7); 21 C.F.R. §§ 814.45(a)(2), 314.125(b)(6), (7), (8) (2001).) After approval, changes in the labeling generally require a supplementary application and approval by the FDA. (21 C.F.R. §§ 814.39, 314.70, 314.71 (2001).) The FDA has the power to withdraw approval of a new medical device or drug permanently or temporarily if it determines on the basis of new evidence that the device or drug is not effective as represented on its labeling. (§§ 360(e), 355(e).) The substantial similarity between the premarket approval and new drug application processes compels the conclusion that the latter also establishes a federal requirement with respect to labeling that can have preemptive effect.

(7) Although the over-the-counter drug monograph system does not require each manufacturer to submit its label for approval, we conclude that system also establishes a federal requirement regarding labeling that can preempt conflicting state requirements. On the effect of that system, *Papike v. Tambrands Inc.* (9th Cir. 1997) 107 F.3d 737 is instructive. The issue in *Papike* was whether a plaintiff's state law claims for failure to warn of the risk of toxic shock syndrome related to tampon use were preempted by the MDA. That act classifies tampons as class II medical devices involving some risk of injury. Their manufacturers must comply with FDA regulations known as "special controls," including a regulation specifying detailed information that tampon labels must contain about toxic shock syndrome. (§ 360c(a)(1)(B); 21 C.F.R. §§ 860.3(c)(2), 801.430(b) (2001).) The plaintiff argued that the regulation was too general to warrant preemption because it allowed manufacturers latitude in the wording, style, and placement of the consumer information, but the appellate court disagreed. It reasoned that unlike the general requirements at issue in *Medtronic, supra,* 518 U.S. 470, the tampon warning regulation reflected " 'the sort of concerns regarding a specific device or field of device regulation which the . . . regulations were designed to protect from potentially contradictory state requirements.' [Citation.]" (*Papike v. Tambrands Inc., supra,* 107 F.3d at pp. 740-741.) The court held that although the tampon regulation provided some flexibility to the manufacturer, it mandated the specific substantive content of the warning on the labeling, thereby preempting state law claims or causes of action based on a theory that the warnings were inadequate. (*Id.* at pp. 741-742.)

We apply the same analysis here. The monograph at issue is specific to pediculicides and sets forth explicit and detailed federal requirements regarding the content of their labels, thereby preempting state law claims that would result in the imposition of different or contradictory labeling.

### D. *Plaintiffs' Claims*

■ We turn to the question of whether plaintiffs' claims are in fact preempted by the foregoing federal requirements.

Plaintiffs argue that their claims for breach of express warranty are not preempted because certain of defendants' representations about their products are voluntary warranties, not statements that federal law required. With respect to NIX, plaintiffs insist that the FDA's approval of that product's label does not mean that the agency required Warner-Lambert to state on the label that one application "Kills Lice & Their Eggs [and] Prevents Reinfestation."

Similar arguments have been made by plaintiffs in cases involving the preemption provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136 et seq.). Under that act, the Environmental Protection Agency (EPA) must approve the labels for pesticides and other products, and states are expressly prohibited from imposing "any requirements for labeling or packaging in addition to or different from those required" under the act. (7 U.S.C. §§ 136a(c)(5), 136v(b).)

Courts considering that preemption provision have held that express warranty claims based on statements made outside the context of approved labeling or packaging, such as claims made orally or in advertising materials, are not necessarily preempted. (*Etcheverry v. Tri-Ag Service, Inc., supra,* 22 Cal.4th at pp. 335-337 [state law claims based on off-label statements addressing matters outside the scope of the approved label are not preempted]; *Sun Valley Packing v. Consep, Inc.* (2001) 94 Cal.App.4th 315, 318 [114 Cal.Rptr.2d 237] [FIFRA does not preempt a claim that is not label-based, such as an oral warranty based on a use contrary to the label instructions]; *Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 711-712 [110 Cal.Rptr.2d 722].)

But when a state law claim, however couched, would effectively require a manufacturer to include additional or different information on a federally approved label, it is preempted. (*Etcheverry v. Tri-Ag Service, Inc., supra,* 22 Cal.4th at p. 335; *Sun Valley Packing v. Consep, Inc., supra,* 94 Cal.App.4th at p. 321; *Welchert v. American Cyanamid, Inc.* (8th Cir. 1995)

59 F.3d 69 [express warranty claim based entirely on herbicide's label statement preempted]; *Taylor AG Industries v. Pure-Gro* (9th Cir. 1995) 54 F.3d 555, 560 [failure-to-warn claims preempted to extent they required additional information on labels].) Although FIFRA does not prescribe the exact content of a label, manufacturers are not free to create labels in any manner they choose; instead, the EPA approves the label only after careful and rigorous review of the product data and the draft label. Thus when a claim is premised ultimately on the inadequacy of the product label, it is preempted. (*Taylor AG Industries v. Pure-Gro, supra,* 54 F.3d at pp. 560-561.)

Warner-Lambert also was not free to devise any label of its choosing for NIX. As we have explained in some detail, the proposed label for NIX was reviewed as part of the demanding new drug application process, and the FDA's approval of that application was contingent on the use of the language in the proposed label, with certain changes specified by the FDA. Plaintiffs' complaint alleges several causes of action or claims regarding NIX: breach of express warranty, fraud and deceit, false advertising, unfair competition, and violations of the Consumer Legal Remedies Act. While the legal theories underlying these causes of action may differ, each is bottomed on the assertion that this approved label is no longer accurate or adequate and that the label should be changed or the product banned. Each cause of action would result in the establishment of a state requirement regarding labeling that would be "different from" and "otherwise not identical with" the federally required label (§ 379r(a)), and each is therefore preempted.

Plaintiffs make a related argument about their express warranty claims against Pfizer and Care. They argue that although the monograph for pediculicides mandates a statement that the product is for the "treatment" of head lice, it does not require the additional statements made by defendants, namely, that RID "kills lice & their eggs," and is a "lice killing shampoo," and that CLEAR "[w]orks fast to kill lice and their eggs."

Plaintiffs do not mention that under the monograph, a pediculicide label must also state: " 'A fine-toothed comb or a special lice/nit removing comb may be used to help remove *dead* lice or their eggs (nits) from hair. A second treatment must be done in 7 to 10 days to *kill* any newly hatched lice.' " (21 C.F.R. § 358.650(b), (d)(2), (3) (2001), italics added.) Plaintiffs also fail to take into account the general regulations governing labeling of all over-the-counter drugs, which provide that the label must contain the indications established in the applicable monograph *"or alternative truthful and nonmisleading statements"* describing those indications. (21 C.F.R. § 330.1(c)(2) (2001), italics added.) In addition, those general regulations

require labeling to state intended uses and results and other matters "in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under customary conditions of purchase and use." (21 C.F.R. § 330.10(a)(4)(v) (2001).)

If treatment results in "dead" lice and nits and a second treatment may be necessary to "kill" newly hatched lice, the only possible conclusion is that the "treatment" of lice is the killing of lice. The challenged statements on the RID and CLEAR labels referring to the killing of lice do nothing more than express in direct, straightforward, and easily understood language that which is implicit in the mandatory labeling. The challenged statements are simply alternative explanations of the information that must be included under the monograph, not express warranties of benefits or results outside the scope of that federal requirement.

Because all of plaintiffs' state law causes of action regarding RID and CLEAR—breach of express warranty, fraud and deceit, false advertising, unfair competition, and violations of the Consumer Legal Remedies Act— are also based ultimately on the assertion that the labels on those products are no longer accurate or adequate, they too cannot escape preemption.

Our conclusion that all of plaintiffs' state law claims are expressly preempted by section 379r(a) makes it unnecessary to consider the theory of conflict preemption, under which state law is preempted to the extent that it actually conflicts with federal law, making it impossible to comply with both state and federal requirements. (See *Peatros v. Bank of America* (2000) 22 Cal.4th 147, 158 [91 Cal.Rptr.2d 659, 990 P.2d 539].)

E.  *The Magnuson-Moss Warranty Act*

■  For several reasons, plaintiffs cannot state a claim under the federal Magnuson-Moss Warranty Act (Magnuson-Moss) (15 U.S.C. § 2301 et seq.). First, Magnuson-Moss is expressly "inapplicable to any written warranty the making or content of which is otherwise governed by Federal law" (15 U.S.C. § 2311(d)). As we have discussed, the FDCA and its implementing regulations govern the labeling at issue here.

Furthermore, Magnuson-Moss applies only to "consumer product[s]," defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . ." (15 U.S.C. § 2301(1).) The act does not otherwise enumerate products within the scope of the definition. The federal Consumer Product Safety Act (15 U.S.C. § 2051 et seq.), however, expressly states that "drugs,

devices, or cosmetics" as defined in the FDCA are not "consumer product[s]." (15 U.S.C. § 2052(a)(1)(H).) Reading these statutes together, at least two courts have concluded that a medical device regulated by the MDA is not a consumer product within the meaning of Magnuson-Moss. (*Goldsmith v. Mentor Corp.* (D.N.H. 1995) 913 F.Supp. 56, 63; *Kemp v. Pfizer, Inc.* (E.D.Mich. 1993) 835 F.Supp. 1015, 1024-1025.) By parity of reasoning, a drug regulated by the FDCA is also not a consumer product within the meaning of Magnuson-Moss.

Finally, it has been held that state law applies in breach of warranty actions as to both implied and written warranty claims under Magnuson-Moss, except as expressly stated by that act. (*Carlson v. General Motors Corp.* (4th Cir. 1989) 883 F.2d 287, 291; *Walsh v. Ford Motor Co.* (D.C. Cir. 1986) 807 F.2d 1000, 1013-1015.) Therefore our conclusion that plaintiffs' express warranty claims under state law are preempted is fatal to any express warranty claim under Magnuson-Moss.

## Disposition

The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 2, 2002. George, C. J., and Chin, J., did not participate therein.